SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARK G. WONDERS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action No. 11-cv-1130 (RLW) |
| | ) | |
| **JOHN M. MCHUGH** | ) | |
| **Secretary, Department of the Army, et. al.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION [1]

Plaintiff Mark G. Wonders, who is proceeding *pro se*, brings this action seeking documents from the United States Army pursuant to the Freedom of Information Act.  Both parties have filed motions for summary judgment.  (Docs. 7, 12.)  For the reasons set forth below, the Court will grant the Army's motion.

---

[1]  This unpublished memorandum opinion is intended solely to inform the parties and any reviewing court of the basis for the instant ruling, or alternatively, to assist in any potential future analysis of the *res judicata*, law of the case, or preclusive effect of the ruling.  The Court has designated this opinion as "not intended for publication," but this Court cannot prevent or prohibit the publication of this opinion in the various and sundry electronic and legal databases (as it is a public document), and this Court cannot prevent or prohibit the citation of this opinion by counsel.  *Cf.* Fed. R. App. P. 32.1.  Nonetheless, as stated in the operational handbook adopted by our Court of Appeals, "counsel are reminded that the Court's decision to issue an unpublished disposition means that the Court sees no precedential value in that disposition."  D.C. Circuit Handbook of Practice and Internal Procedures 43 (2011).

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Moore v. Hartman,* 571 F.3d 62, 66 (D.C. Cir. 2009) (citing Fed. R. Civ. P. 56(c)); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986)).  A genuine issue of material fact exists if the evidence, viewed in the light most favorable to the non-movant, "is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  A non-moving party, however, must provide more than "a scintilla of evidence" in support of its position; the quantum of evidence must be such that a jury could reasonably find for the non-moving party.  *Id.* at 252.

Here, both parties have moved for summary judgment.  Thus, the Court must analyze the Defendant's motion while viewing the facts in the light most favorable to Wonders and, alternatively, analyze Wonders' motion while viewing the facts in the light most favorable to the Defendant.  *See Johnson v. District of Columbia*, 528 F.3d 969, 973-78 (D.C. Cir. 2008).

For purposes of summary judgment in a FOIA case, the agency's decision to withhold information from a requester is subject to *de novo* review by the district court.  5 U.S.C. § 552 (a)(4)(B).

## II.  BACKGROUND

A.      Wonders' FIOA Request and the Army's Response

Plaintiff was employed as a Public Affairs Specialist at the United States Army Aviation Center of Excellence in Fort Rucker, Alabama.  According to his complaint, Wonders made

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

several "serious" ethics charges against an attorney who was then practicing in the Judge Advocate General's ("JAG") office at Fort Rucker.  The nature of those charges is unclear, but it appears that the charges relate to her handling of Wonders' prior FOIA requests and possibly to her handling of his prior employment/EEO complaints.  (*See* Doc. 12-3, Def.'s Summ J. Ex. B, Anderson Decl. ¶ 5; Doc. 6, Pl.'s Summ. J. Br. at p. 2.)  As will be discussed more fully below, the gist of the complaints is that the attorney made misrepresentations during his employment/EEO proceedings, she either did or threatened to violate an arbitrator's ruling and she withheld information from the Plaintiff and his attorney.

On March 23, 2011, the Army Professional Responsibility Branch ("PRB") informed Wonders that it had completed its "review" of his allegations and assured him that all "credible allegations" of attorney professional misconduct are throughly investigated and disciplinary actions taken, if warranted.  (Doc. 12-3, Def.'s Summ J. Ex. A, Garrett Decl. at enclosure 2)(hereafter "Garrett Decl.") Pursuant to the Privacy Act, however, the Army explained that it was prohibited from disclosing the results of that review.  (*Id*.)

In response, Wonders filed a FOIA request seeking "any and all documents generated by [his] 17 February and 24 February 2011 charges of professional misconduct made against" the attorney, including "all notes and findings" relating to the ethics charges.  (Garrett Decl. at enclosure 3.)  The Army responded that it could not confirm or deny the existence of the requested records due to privacy concerns; however, the Army took the position that if such records existed they would be exempt from disclosure under FOIA Exemptions 5 (deliberative process), 6 (personnel or medical records) and 7 (law enforcement records).  (*Id*. at enclosure 4.)

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

Wonders administratively appealed the denial of his request.  As a basis for his appeal he explained that the attorney's actions "directly impacted [his] career, health and well being." (Garrett Decl. at enclosure 5.)  He also contended that he was within his rights to possess the requested information.  (*Id*.)

Denying his appeal, the Army's Office of General Counsel explained that the PRB had properly withheld the results of the review from Wonders.  Further, Professional Responsibility records are considered sensitive and the Army concluded that Wonders had only demonstrated a private, not public, interest in the documents, which could not overcome the attorney's protected privacy interests.  (Garrett Decl. at enclosure 6.)

In his complaint initiating this lawsuit, Wonders asks the Court to compel the Army to release "any and all information directly relating to the [February 17 and 24, 2011] complaints,[2] including notes, complete investigative reports and findings, along with any and all related correspondence."  (Compl. at ECF p. 1.)  Wonders contends that disclosure of the documents is warranted in the "interest of justice" and because the attorney's actions have "directly impacted [his] health, family and financial wellbeing."  (*Id*.)  Wonders attached a letter to his complaint that indicates he needs to obtain the requested information in order to "verify [his] position" and prevent "further actions against him by Fort Rucker officials."  (*Id*. at p. 4.)

B.      PRB Investigations of Ethical Complaints

In support of its FOIA response, the Army primarily relies on the declaration of James

---

[2]  Although his complaint references ethics complaints made on February 17, 24, 25, and May 14, his FOIA request specifically mentions only the February 17 and 24 ethics complaints. (*See* Doc. 12-3, Def.'s Summ. J. Ex. A, Garrett Decl. at enclosure 3.)

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE
OFFICIAL REPORTERS

Garrett who is the Chief of the JAG PRB.  (Garrett Decl. ¶ 1.)  The PRB is responsible for

overseeing the professional responsibility program for attorneys in the Army's JAG office.  As

such, the PRB assists the Judge Advocate General in exercising his statutory and regulatory

responsibilities to regulate lawyers, who are licensed by one or more states to practice law.  (*See*

Garrett Decl. ¶ 2.)  JAG attorneys are subject to the restrictions, licencing requirements, and

sanctions imposed by their state bar(s), as well as Army restrictions and sanctions.  (*Id*.)

When the PRB receives an ethics complaint about a JAG lawyer, a PRB supervisor

reviews the complaint to determine if it is "credible"; that is, whether the "information received

provides a reasonable belief that a violation occurred."   (Garrett Decl. ¶ 6; Garrett Decl. at

enclosure 1,  p. 15.)  If the complaint is not credible, "a copy of any response to the complaint,

with all associated documentation, will be retained in accordance with applicable filing

regulations."  (*Id*. at p. 15.)  According to Garrett, just because the PRB receives a complaint and

reviews the allegations in the complaint, "does not mean that any documentation was created."

(Garrett Decl. ¶ 11.)

"Credible" complaints that "raise a substantial question as to a lawyer's honesty,

trustworthiness, or fitness as a lawyer . . . will be informally investigated by means of a

preliminary screening," which involves obtaining witness statements, making findings, making

legal evaluations and making recommendations.  (Garrett Decl. ¶¶  4, 7; Garrett Decl. at

enclosure 1, p. 15.)  The results are forwarded to and considered by the PRB Chief, the Judge

Advocate General Chief or his Deputy, and possibly a Professional Responsibility Committee.

Ultimately the Judge Advocate General makes a decision concerning the proper response to the complaint.

PRB investigatory records include documents relating to "specific, credible allegations of professional misconduct against agency attorneys, which may result in civil or criminal sanctions, or adverse administrative action." (Garrett Decl. ¶ 7.) These "investigation records are maintained in a system of records filed by the name of the attorney against whom allegations are made and contain: allegations, information and records relating to attorney representation of individual clients and the Army, statements, comments, factual analysis, judgmental analyses, legal analyses, options, evaluation of options, and instructions for subordinate offices to conduct preliminary screening inquiries into named individuals." (Garret Decl. ¶ 5.)

According to Garrett, whether or not a PRB investigation actually results in a finding of misconduct, such investigations "carry a significant stigma." (Garrett Decl. ¶ 8.) Indeed, he indicates that the mere occurrence of an investigation can lead to rumors, professional prejudice, embarrassment, harassment and can significantly and irreparably damage the reputation of the investigated attorney. (Garrett Decl. ¶ 8.) Therefore, professional conduct records are not released to attorney personnel managers unless the allegations result in formal disciplinary action which can take various forms, including "referral of the matter to the attorney's state bar for consideration of either civil or criminal sanctions." (Garrett Decl. ¶¶ 8, 12(a).)

### III.  FOIA

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

Pursuant to the Freedom of Information Act ("FOIA"), federal "agenc[ies] shall make available to the public," records in the agency's possession unless the information found in those records is exempted from disclosure under one of FOIA's nine statutory exemptions.  5 U.S.C. §§ 552(a), 552(b).  As an alternative to withholding the documents pursuant to an exemption, an agency "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a FOIA exception."  *Gardels v. C. I. A.*, 689 F.2d 1100, 1103 (D.C. Cir. 1982).  Such a response is called a "*Glomar*" response and this type of response is appropriate where actually admitting or denying the existence of the requested documents would disclose the exempt information.  *Electronic Privacy Information Center v. National Sec. Agency,* 678 F.3d 926, 931 (D.C. Cir. 2012).  Army regulations specifically provide for assertion of a *Glomar* response where acknowledging the existence or nonexistence of responsive law enforcement documents would in itself reveal personally private information and the individual's privacy interests outweigh any potential public interest in such an acknowledgment.  32 C.F.R. § 518.13(g)(1)(iv).

When determining whether the agency properly asserted a *Glomar* defense, "courts apply the general exemption review standards established in non-*Glomar* cases."  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (citation omitted).[3]  "Ultimately, an agency's justification for

---

[3] The Glomar response takes its name from "the Hughes Glomar Explorer, a ship used in a classified Central Intelligence Agency project to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.  Responding to a journalist's FOIA request for records regarding the CIA's alleged efforts to convince media

invoking a FOIA exemption is sufficient if it appears logical or plausible." *Electronic Privacy*, 678 F.3d at 931 (citations and internal quotation marks omitted).  However, in order to obtain summary judgment in *Glomar* cases, the agency's affidavits must "contain reasonable specificity of detail rather than merely conclusory statements" and the affidavits must "not [be] called into question by contradictory evidence in the record or by evidence of agency bad faith."  *Electronic Privacy*, 678 F.3d at 931 (citations and internal quotation marks omitted).


## IV.  ANALYSIS

FOIA exemption 7(C) is at issue here. [4]  That exemption shields from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7).  In the present case, the Army argues that admitting or denying the existence of an investigation into Wonders' ethics complaint would constitute an unwarranted invasion of the attorney's privacy.  Alternatively, the Army argues that even if such documents did exist, they would be exempt from disclosure for

---

outlets not to make public what they had learned about the Hughes Glomar Explorer, the Agency refused to either confirm or deny whether it had such records."  *Roth v. United States Dept. of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (citations and internal quotation marks omitted).

[4] The Army also relies on Exemptions 5 (deliberative process) and 6(b) (personnel and medical records).  Because the Court finds that the Army properly relied on Exemption 7(C), the Court need not "consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)."  *Roth*, 642 F.3d at 1173.  The Court declines to this reach the Army's deliberative process privilege argument.

the same reason.

Because determining whether the agency properly asserted a *Glomar* defense requires

applying the  "the general exemption review standards established in non-*Glomar* cases," the

Court will first analyze whether the purported documents were properly withheld pursuant to

Exemption 7(C).  *See Wolf* , 473 F.3d at 374 (citation omitted).


A.      Exemption 7(C): Law Enforcement Purposes

When applying Exemption 7(C), the Court must first determine whether the requested

records were "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7)(C).[5]  To meet this

definition, the government has the burden of establishing that the records (or in this case, the

alleged records) "were compiled for adjudicative or enforcement purposes; the government,

however, need not show that the investigation led to, or will lead to, adjudicative or enforcement

proceedings."  *Stern v. FBI*, 737 F.2d 84, 88 (D.C. Cir. 1984) (citations omitted).  An

adjudicative or enforcement purpose may include an investigation into the "agency's own

activities and employees."  *Stern*, 737 F.2d at 89.  However, not all of these types of

investigations are exempt under 7(C).

Where an agency, acting in its role as an employer, compiles information for the purpose

---

[5]  Prior to 1986, Exemption 7 required a threshold showing that the materials in question
were "investigatory records compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)
(1982). However, in 1986, Congress amended the exemption to protect 'records or information
compiled for law enforcement purposes,' deleting any requirement that the information be
'investigatory.'"  *Tax Analysts v. I.R.S.*, 294 F.3d 71, 79 (D.C. Cir. 2002).

of monitoring its employees' compliance with the agency's statutory mandate or the agency's regulations, such information is "not protected from public scrutiny under Exemption 7 . . . ." *Stern*, 737 F.2d at 89 (citation omitted).[6]  In other words, information collected during the "customary surveillance of the performance of duties by government employees" does not fall within Exemption 7(C)'s protection, even though such surveillance might reveal evidence that later could give rise to a law enforcement investigation.  *See Jefferson v. DOJ, Office of Professional Responsibility*, 284 F.3d 172, 177 (D.C. Cir. 2002) (citation omitted).  On the other hand, Exemption 7(C) does protect information collected as a result of an investigation that "focuses 'directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions.'" *Stern.* 737 F.2d at 89 (citation omitted).

The Court finds that the purported records constitute records "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7)(C).  This is not a case involving reports that contain "the findings of any investigation undertaken upon matters that appear not to involve a violation of law." *See Jefferson*, 284 F.3d at 178 (citation omitted).  In other words, the scope of the investigation was not limited to determining whether there was a violation of an internal agency policy or regulation.  *See Stern*, 737 F.2d at 89.  Rather, any investigation involved here was undertaken in response to "specifically alleged" act(s) of misrepresentation that could have

_____

[6] Such documents might, however, be protected under another exemption, such as Exemption 6.  *Stern*, 737 F.2d at 89 (citation omitted).

resulted in civil sanctions by the attorney's state bar association.  *See id*.; *Jefferson*, 284 F.3d at 182 (Randolph, J. dissenting) ("The ethical rules for lawyers contain enforceable standards and violations carry civil if not criminal sanctions."); Wisconsin Rules of Professional Conduct for Attorneys, SCR 20:8.4; 20:4; 20.09; 21.02; 21:15 -16; *Kimberlin v. DOJ*, 139 F.3d 944, 947-48 (D.C. Cir. 1998) (finding DOJ investigation into an Assistant United States Attorney's "potentially illegal" alleged conduct was for "law enforcement purposes").  Thus, the purported records meet the threshold test for Exemption 7(C).  [7]

---

[7]   The Court rejects the Army's argument that PRB records are "categorically" protected from disclosure under Exemption 7(C).  First, the Court is not convinced that all PRB files are law enforcement documents.  It appears that the PRB receives complaints regarding violations of not only the American Bar Association Rules of Professional Conduct, but also alleged violations of Army professional conduct rules and "other applicable ethical standards." (Garrett Decl. at enclosure 1, Army Regulation 27-2.)  Thus, without knowing more about the precise parameters of  PRB oversight and Army "ethical standards," it seems possible that the PRB might, for example, receive a complaint that an unmarried JAG attorney is having an affair with a married Army officer, who is not a client.  Or, the PRB might receive a complaint that a JAG supervisor is involved in a consensual intimate relationship with a subordinate.

In such a case, without knowing more, it is possible the PRB could be called upon to investigate the attorney for potentially unethical conduct as defined by the Army, which might lead to internal sanctions, but not lead to possible civil or criminal sanctions.  *See* Uniform Code of Military Justice, Article 134, 10 U.S.C. § 934 (prohibiting conduct which is of a nature to bring discredit upon the armed forces, or conduct which is prejudicial to good order and discipline).  As such, any investigatory files would contain information collected for the purpose of monitoring employees for compliance with internal "employer" related standards of conduct.  *Jefferson*, 284 F.3d at 177-78 (rejecting the categorical exemption of DOJ records in the Office of Professional Responsibility because the records could contain investigations into violations of department policy) (citing *Kimberlin*, 139 F.3d at 947; *Beck v. DOJ*, 997 F.2d 1489, 1492 (D.C. Cir. 1993); *Stern*, 737 F.2d at 91 (noting that "rigid compartmentalization, [and] per se rules of nondisclosure based upon the type of document requested . . . are generally disfavored.").  Therefore, any "categorical" withholding of such files is not warranted under the record presently before the Court.

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

B.      Balancing Private and Public Interests

The Exemption 7(C) analysis next requires that the Court determine whether disclosing the requested records "could reasonably be expected to constitute an <u>unwarranted</u> invasion of personal privacy."  5 U.S.C. § 552 (b)(7)(C) (emphasis added).  Making this determination requires a balancing of the potential privacy invasion that might occur if the records are disclosed  against the public interest favoring disclosure.  *Roth*, 642 F.3d at 1174 (citation omitted).

There is no question that the JAG attorney has a privacy interest in the requested records, should they exist.  *See, e.g., Schwarz v. Department of State, Office of Freedom of Information, Privacy and Classification Review*, 172 F.3d 921, 1 (D.C. Cir. 1998 ) (unpublished table decision) (citing 5 U.S.C. § 552a(b)) ("The Privacy Act [generally] prevents an agency from disclosing an individual's records, contained in a 'system of records' without the written consent of that individual.").  Moreover, as a government official, a JAG attorney has "a legitimate interest in preserving the secrecy of matters that conceivably could subject [her] to annoyance or harassment in either [her] official or private li[fe]." *Baez v. DOJ,* 647 F.2d 1328, 1339 (D.C. Cir. 1980) (citation omitted).

In the present case, it is undisputed that any evidence regarding PRB investigations <u>can</u> lead to rumors, professional prejudice, embarrassment, harassment and can significantly and irreparably damage the reputation of the investigated attorney.  (Garrett Decl. ¶ 8.)  These considerations satisfy the privacy protections inherent in Exemption 7(C) which only requires

that any disclosure "<u>could</u> reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552 (b)(7)(C) (emphasis added).

Whether the disclosure of the requested information could reasonably lead to an "unwarranted" invasion of privacy requires a balancing of the JAG attorney's privacy interest against the interest of the public in disclosure of the requested documents.  *See Martin v. DOJ*, 488 F.3d 446, 457 (D.C. Cir. 2007) (citing *National Archives and Records Admin. v. Favish*, 541 U.S. 157, 171 (2004)).  In his complaint and supporting documents, Wonders asserts only a personal interest in the requested information.  He demands disclosure: (1) because the JAG attorney's actions have "directly impacted [his] health, family and financial wellbeing"; and (2) to "verify [his] position" and to prevent "further actions against him by Fort Rucker officials." (Compl. at ECF p. 4.)  Such interests are not recognized as "public interests" for purposes of Exemption 7(C).  *See Oguaju v. United States*, 288 F.3d 448, 451 (D.C. Cir. 2002) (Plaintiff's "personal stake in using the requested records . . . does not count in the calculation of the public interest."), *rev'd on other grounds sub nom*, *Oguaju v. United States Marshals Service*, 541 U.S. 970 (2004).

In Wonders' briefs and supporting documents, he also contends that disclosure of the requested information is for the "good of the government and all concerned."  (Doc. 14-2, Pl.'s Resp. at p. 2.)  He goes on to quote virtually verbatim from numerous pages of the Exemption 6 discussion found in the "United States Department of Justice Guide to the Freedom of Information Act."  The cited material includes a section which discusses the public interest in disclosure of documents as a "check against corruption and to hold the governors accountable to

the governed."  (Doc. 6, Pl.'s Summ. J. Br. at 6) (citing *NLRB v. Robbins Tire & Rubber Co*.,

437 U.S. 214, 242 (1978)).  According to Wonders, it is "highly unlikely" that the JAG office

"initiated the proper corrective actions described in [the] Army Regulations" in response to

Plaintiff's original complaints.  (Doc. 14-2, Pl's. Summ. J. Resp. at 3.) [8]

     The United States Court of Appeals for the District of Columbia has recognized that the

public might have an interest in knowing that the government conducted an adequate

investigation and took appropriate measures to address alleged misconduct.  *Stern*, 737 F.2d at

92.  At the same time, however, where the requester alleges that the public interest relates to

potential government wrongdoing "the requester must produce evidence that would warrant a

belief by a reasonable person that the alleged Government impropriety might have occurred."

*Martin*, 488 F.3d at 458 (citation omitted ).  Thus, a requester's "bare suspicion" of impropriety

is not sufficient to overcome withholding under Exemption 7(C).  *See Roth*, 642 F.3d at 1178

(citing *Favish*, 541 U.S. at 174).

     In support of his claims, Wonders relies on the following alleged "facts":

- The Supreme Court of Wisconsin Office of Lawyer Responsibility responded to his complaint by stating that the JAG attorney told the office that "she had informed the Union of the Agency's decision 'not to forward the request to OPM.'" (Doc. 6, Pl.'s Summ J. Br. ¶ 3; Doc. 6-1, Pl.'s Summ. J. Br. at enclosure 3.)

- The JAG attorney "advises [Wonders'] supervisor that she could violate the Arbitrator [sic] ruling that [his] office be returned status quo ante by possibly removing the television from [his] office."  (Doc. 6, Pl.'s Summ. J. Br. ¶ 5; Doc. 6-1, Pl.'s Summ. J. Br. at enclosure. 5.)

---

    [8]  Because the privacy interests protected under Exemption 7(C) are "somewhat broader" than those protected under Exemption 6, cases balancing the privacy interests under Exemption 6 are useful when balancing under Exemption 7.  *See* Stern, 737 F.2d at 91 (citations omitted).

SUMMARY MEMORANDUM OPINION; NOT INTENDED FOR PUBLICATION IN THE
OFFICIAL REPORTERS

- The JAG attorney "advises senior leadership not to approve [his] future sick leave requests" (Doc. 6, Pl.'s Summ. J. Br. ¶ 6.; Doc. 6-1, Pl.'s Summ. J. Br. at enclosure 6.)

- The JAG attorney advised Wonders' attorney that Wonders would not receive back pay from a decision rescinding his indefinite suspension. (Doc. 6, Pl.'s Summ. J. Br. ¶ 7; Doc. 6-1, Pl.'s Summ. J. Br. at enclosure 7.)

- The JAG attorney "files a false misrepresentation of [his] June 7, 2010, Negotiated Grievance Complaint - - adding charges which occurred after this date -- in justifying denial of [his] rights to files [sic] an EEO complaint."  (Doc. 6, Pl.'s Summ. J. Br. ¶ 8; Doc. 6-1, Pl.'s Summ. J. Br. at enclosure 8.)

- A Fort Rucker official testified that the JAG attorney "willfully" withheld from Plaintiff a letter restoring his security clearance and "added more stuff to the security office to muddy up Plaintiff's record and delay security clearance exoneration."  (Doc. 14-2, Pl.'s Resp. at p. 2.) [9]

- The JAG attorney's withholding of the security clearance document, along with, the "disturbing revelations" uncovered at arbitration, apparently led to settlement of some of his employment claims.  (Doc. 14-2, Pl's Resp. at p. 2.)

- The PRB Chief has a vested interest in seeing that "this apparently rampant lack of ethical conduct at Fort Rucker . . . does not leak out to prevent further embarrassment to both the Army and [the Chief's] efforts to control or correct it."  (Doc. 14-2, Pl's Resp. at p. 3.)

- Wonders apparently filed an ethics charge against a supervisor and Wonders alleges that the supervisor's role in the alleged misconduct by the JAG attorney means it is "highly unlikely" that the JAG office "initiated the proper corrective actions" in response to Plaintiff's original complaints.  (Doc. 14-2, Pl's Resp. at p. 3.) [10]

These and similar "facts" form the basis of Wonders' argument that he has made a "meaningful

---

[9]   Although Plaintiff cites to enclosure 6, no such attachment appears on the ECF version of his Reply in Opposition to Defendant's Motion for Summary Judgment.  (*See* Doc. 14-2, Pl's Resp. at 2.)

[10]   Plaintiff also appears to  allege FOIA and Privacy Act violations involving a "No Records Certificate."(*See* Doc. 14-2, Pl's Resp. at pp. 2-3; Doc. 14-3, Pl's Ex. A, Transcript at pp. 56-58.)  To the extent he makes such claims, they are not before this Court.

evidentiary showing" of alleged misconduct.  (*See* Doc. 6, Pl.'s Summ. J. Br. at p. 7.).

The Court disagrees.  Much of what Wonders has alleged and placed into the record is not comprehensible because he has not provided any context for his allegations.  Of the allegations that are somewhat decipherable, many do not necessarily point to evidence of misconduct or the documents he submitted do not support any alleged misconduct by the agency.  Wonders needs more than his "bare suspicions" of agency-wide wrongdoing are "overcome 'the presumption of legitimacy accorded to the Government's official conduct.'" *Oguaju*, 378 F.3d at 1117 (citing *Favish*, 541 U.S. at 174).

He fares no better with his "evidence" relating to the JAG attorney he claims engaged in wrongdoing.  For example, Wonders placed in the record a letter that allegedly shows the JAG attorney violated some unidentified ethical rule by advising management to deny his future requests for leave.  (Doc. 6-1, Pl.'s Summ. J. at enclosure 6.)  However, the letter clearly states "I would approve the sick leave if he has submitted a 71, however, I would make sure he is aware that if he does not follow the appropriate procedures in the future, that any requests that are not submitted appropriately may be denied."  (*Id*.)  This Court can find no misconduct in an attorney advising her agency that it should require agency employees to follow the proper procedures before granting sick leave requests.

In another example, Wonders alleges that the JAG attorney admitted to the Wisconsin Office for Lawyer Regulation that she had "informed the Union of the Agency's decision not to forward the request to OPM."  (Doc. 6-1, Pl.'s Summ. J. at enclosure 3.)  The context here is unclear.  What is clear, however, is that the Office investigated Wonders' complaint and

concluded that his submissions did "not support an allegation that [the JAG attorney] misled the arbitrator." (Doc. 6-1, Pl.'s Summ. J. Br. at enclosure 3.) Accordingly, "evidence" of this sort would not lead a reasonable person to believe the JAG attorney engaged in misconduct.

Even if Wonders did have some evidence that the JAG attorney had done so, he still proffers no evidence that would establish sufficient public interest in disclosure of the requested information. The FOIA "focuses on the citizens' right to be informed about 'what their government is up to.'" *DOJ v. Reporters Committee For Freedom of Press*, 489 U.S. 749, 773 (1989) (emphasis added and citation omitted). Thus, in past cases, information about possible misconduct by a single-attorney generally did not establish evidence regarding what the agency as an organization "was up to." *See, e.g., Mueller v. United States Dept. of Air Force*, 63 F. Supp. 2d 738, 744 (E.D. Va. 1999) (finding that investigation of prosecutor accused of prosecutorial misconduct did not constitute "public interest" sufficient to warrant disclosure of report because records relating to "a single isolated investigation reveals relatively little about the conduct of the [agency]").

For example, in *Stern v. FBI*, this Circuit explained that the "the level of responsibility held by a federal employee, as well as the activity for which such an employee has been censured, are appropriate considerations for determining the extent of the public's interest in knowing the identity of that censured employee." 737 F.2d at 92 (citation omitted). The Circuit went on to find in *Kimberlin v. Department of Justice*, that a DOJ investigation into an agency staff-level attorney "in connection with the possibly unauthorized and perhaps illegal release of information to the press . . . would occasion an invasion of [the attorney's] privacy

disproportionate to, and therefore 'unwarranted' by, such insight as the public would gain into 'what the Government is up to."  139 F.3d at 949 (citing *Reporters Committee* 489 U.S. at 750)).  Similarly, in the instant case, even if Wonders had evidence of the JAG attorney's misconduct he would not necessarily have evidence that the agency was up to no good.  In the face of such precedent and given the evidentiary submissions of the parties, the instant Court is unable to find that any public interest, if at all, in disclosure outweighs the Exemption 7(C) privacy interests of the JAG attorney.

C.     *Glomar*

Having determined that any undisclosed information, to the extent it exists, was properly withheld under Exemption 7(C), the Court also finds that the Army properly relied on the *Glomar* response.  As indicated above, when determining whether the agency properly asserted a *Glomar* defense, "courts apply the general exemption review standards established in non-*Glomar* cases." *See Wolf v. CIA.*, 473 F.3d 370, 374 (D.C. Cir. 2007) (citation omitted).  Thus, with respect to Exemption 7(C), "a *Glomar* response is appropriate where an acknowledgment that records exist would provide the requester with the very information the exemption is designed to protect; that is, whether an individual has been the target of a law enforcement investigation."  *Nation Magazine, Washington Bureau v. United States Customs Service*, 71 F.3d 885, 894 n.8 (D.C. Cir. 1995).

As the Army regulations recognize, such an acknowledgment would do just that:

> A "refusal to confirm or deny" response must be used consistently, not only when a record exists, but also when a record does not exist. Otherwise, the pattern of using a "no records" response when a record does not exist and a "refusal to confirm or deny" when a record does exist will itself disclose personally private information.

32 C.F.R. § 518.13(g)(1)(v).

The Court further finds that the Army did not waive its ability to rely on the *Glomar* response simply because it acknowledged it had completed its "review" of Wonders' ethics complaints. An agency is prohibited from relying on a *Glomar* response where it has "officially acknowledged the existence of the record" at issue. *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011). In the present case, however, the Army only acknowledged that it had completed its review of Wonder's complaint. According to Garrett, a "review" of a complaint does not necessarily lead to creation of any "documentation." (Garrett Decl. ¶ 11.) Although Army regulations require that the agency retain any "associated documentation" regarding a complaint, (Garrett Decl. at enclosure 1, Army Regulation 27-2), one can imagine that no documentation might be created in some situations. For example, if a complainant files an ethics charge that is baseless on the face of the document and the complainant fails to submit any supporting documentation, no "associated documentation" would exist.

D.    Redaction & *In Camera* Inspection Not Appropriate

Wonders makes three final arguments. First, he urges the Court to conduct an *in camera* inspection to ascertain whether the Army's FOIA response was appropriate. However, ordering an inspection would essentially require that the Army admit or deny whether the requested records exist. This would be inconsistent with this Court finding that the Army properly invoked

the *Glomar* response.

Second, Wonders relies on Exemption 6, which allows an agency to withhold personnel, medical or similar files. 5 U.S.C. § 552(b)(6).  Because the Army cannot rely on Exemption 6 to withhold information about the requester, Wonders argues that the Army is obligated to release these files which he views as "pertaining only to himself."  (Doc. 6, Pl.'s Summ. J. Br. at 3); *see* 5 U.S.C. § 552(b)(6).  He contends that all "unnecessary personally identifiable" information about the JAG attorney can be redacted.  (Doc. 11, Pl.'s Summ. J. Reply at 2.)

Wonders misapplies the law, however.  The files sought by Wonders are not <u>his</u> personnel or similar fails, rather they are the personnel or similar files of a third party.  Therefore, he cannot rely on Exemption 6 as a basis to require disclosure.

Moreover, the Court has decided that the Army's response to his request was proper under Exemption 7(C) and there is precedent for asserting a *Glomar* defense, even where the requester seeks documents which may relate to or identify the requester.  *See Oguaju*, 288 F.3d at 450 (noting that the requester's "personal stake" in the records "does not count in the calculation of the public interest").

Finally, redaction would not serve to diminish an "unwarranted" invasion of privacy because the documents relate specifically to Wonders' charges against the attorney.  Thus, deleting the attorney's name would disclose that she was the subject of an investigation.  As such, deleting the attorney's name, when it is known that she was under investigation, would be pointless.  *See Mueller v. United States Dept. Of Air Force*, 63 F. Supp. 2d 738, 744 (E.D. Va. 1999) (citing *Hunt v. FBI*, 972 F.2d 286, 288 (9th Cir. 1992)).  This case is not like *Stern* v. *FBI*,

or *Department of Air Force v. Rose,* where the names and identifying information were redacted, but the released information was of such volume or nature that the identities of the investigated individuals were not readily ascertainable.  *Stern*,  737 F.2d at 91-93 (upholding agency's redaction of the identities of two-low level employees implicated in the midst of a "massive criminal" investigation by the DOJ into alleged FBI misconduct); *Department of Air Force v. Rose*, 425 U.S. 352 (1976) (discussed in *Reporters Committee*, 489 U.S. at 767-78)).

## V. CONCLUSION

For the reasons set forth above, even viewing the facts in the light most favorable to Wonders, the Court finds that the Army is entitled to summary judgment.  Accordingly, by separate order, judgement will be entered in favor of the Army.

SO ORDERED.
September 11, 2012

_____
Robert L. Wilkins
United States District Judge